UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RUSSELL M. MORRIS and
JENNIFER L. MORRIS

Plaintiffs

v.

BAC HOME LOANS SERVICING, LP

Defendant

Civil Action No.
10-11572-PBS

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

**Introduction**

1. For almost two years, the homeowner-plaintiffs applied to defendant BAC Home Loans Servicing, LP for a loan modification. BAC is contractually obligated to evaluate and offer the Plaintiffs a loan modification under a federal loan-modification program. But the Plaintiffs' applications were repeatedly lost or ignored, and they were never evaluated for the program. Instead, BAC took months to respond and then offered agreements that unfairly increased Plaintiffs' payments or otherwise violated the program guidelines. BAC also initiated foreclosure on the Plaintiffs despite being prohibited from doing so. The Plaintiffs now file this Amended Complaint for violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A.

**Parties**

2. Russell M. Morris and Jennifer L. Morris ("the Morrises"), husband and wife, are natural persons residing at 570 Essex Ave., Unit 2, Gloucester, Essex County, MA 01930.

3. BAC Home Loans Servicing, LP ("BAC"), doing business as Bank of America Home Loans, is a Texas limited partnership with principal offices located at 6400 Legacy Dr., Plano, TX 75024. BAC regularly does business in Massachusetts. BAC is in the business of servicing and originating mortgage loans.

**General Allegations**

4. In 2007, the Morrises refinanced their mortgage with a loan in the amont of $288,000 from Bank of America, N.A., secured by a mortgage in favor of Bank of America, N.A.

5. Defendant BAC, formerly known as Countrywide Home Loans Servicing, L.P., is a subsidiary of the nationally chartered bank Bank of America, N.A.

6. The Federal National Mortgage Association (better known as "Fannie Mae") is the owner of the Morrises' mortgage.

7. Fannie Mae is a government-sponsored enterprise chartered by the United States Congress to provide liquidity, stability, and affordability to the U.S. residential housing market.

8. Fannie Mae does not make loans directly to homebuyers. After borrowers complete the closing process on their mortgage loans, Fannie Mae buys those mortgages from their approved lenders. The process of replenishing the supply of funds enables the lenders to make more mortgage loans to other borrowers.

9. Because Fannie Mae has a public purpose, and because it commands a large share of the residential mortgage market, it is able to regulate and restrict the ways that the mortgages it owns are serviced. Its servicing regulations are intended to insure that homeowners are treated fairly, and that homeowners are not foreclosed on unnecessarily.

10. Fannie Mae does not directly receive payments from the borrowers whose mortgages it owns. Rather, it contracts with mortgage companies, known in industry terms as "servicers," such as BAC, to act as the intermediaries between itself and borrowers.

11. These servicers collect payments, send billing statements, and generally act in the place of Fannie Mae in almost all respects to the borrower.

12. In fact, most homeowners whose mortgage loans are owned by Fannie Mae are unaware that Fannie Mae is the owners of their mortgages.

13. Fannie Mae maintains control over the manner in which its mortgages are serviced. In order to service Fannie Mae mortgages, servicers must agree to follow servicing instructions Fannie Mae promulgates, which come from the servicing contract itself, servicing guides, announcements, letters, and notices. These are publicly available documents available online at https://www.efanniemae.com/sf/guides/ssg/#ssg.

14. BAC, as the servicer of the Morrises' mortgage, acts on behalf of Fannie Mae in all respects by collecting mortgage payments, sending monthly billings statements, modifying loans if required, and conducting foreclosures when necessary.

15. BAC, because of its servicing contract with Fannie Mae, is obligated to follow Fannie Mae's servicing instructions.

16. The Morrises' mortgage is subject to all Fannie Mae guidelines. BAC is obligated to comply with these Fannie Mae guidelines with respect to the Morrises' mortgage.

17. To avert the ongoing national foreclosure crisis, and to preserve the American tradition of homeownership, the U.S. Department of the Treasury established the federal Home Affordable Modification Program ("HAMP") in March 2009.

18. The statutory authority for the creation of the HAMP program is the Emergency Economic Stabilization Act of 2008, §§ 101 and 109, as amended by the American Recovery and Reinvestment Act of 2009, § 7002.

19. HAMP's purpose is to modify the mortgages on principal residences of eligible homeowners by reducing their monthly mortgage payments.

20. Eligible homeowners are those who owe less than $729,000 on their first mortgage, occupy the house as their principal residence, and whose mortgages were originated prior to January 1, 2009.

21. HAMP reduces interest rates of homeowners' mortgages, allows capitalization of past-due amounts, extends the repayment period of the mortgages, and allows deferred payments of principal.

22. Fannie Mae has instructed BAC, as well as its other servicers, to evaluate homeowners for loan modifications under HAMP before foreclosing on them.

23. Those guidelines, which are promulgated by Fannie Mae, provide a comprehensive step-by-step process under which mortgage servicers must evaluate homeowners for loan modifications that reduce homeowners' mortgage interest rates, extend the repayment period of the loans, and/or defer principal.

24. Those guidelines require that servicers, including BAC, reduce the mortgage payment of principal, interest, taxes, and insurance ("PITI") on a borrower's first-lien mortgage to 31% of the borrower's monthly pre-tax income.

25. To evaluate borrowers for a loan modification under HAMP, servicers, including BAC, are required to apply the "waterfall," a series of steps to reduce the monthly mortgage payment and modify the loan.

26. First, the waterfall reduces the interest rate to as low as 2% to try to reduce the PITI payment to 31% of the borrower's monthly pre-tax income.

27. If this interest rate reduction is not enough to reduce the PITI payment to 31%, the servicer must take the next step of the waterfall.

28. Next, the servicer must extend the repayment term of the mortgage to a maximum of 40 years to further reduce the monthly mortgage payment.

29. If this repayment term extension is not enough to reduce the PITI payment to 31%, the servicer must take the final step of the waterfall.

30. Finally, the servicer must allow a forbearance of up to 30% of the principal balance of the mortgage to try to reach the 31% of monthly pre-tax income target.

31. The above-described waterfall guidelines are specifically laid out in Fannie Mae Announcement 09-05R. Announcement 09-05R is available online at https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2009/0905.pdf and is incorporated by reference.

32. Servicers, including BAC, are obligated under their servicing contracts to follow Fannie Mae announcements.

33. A servicer is required to begin this loan-modification evaluation upon receipt of a completed application and supporting financial documentation.

34. Fannie Mae Announcement 09-31, p. 7, states that within 30 calendar days of receiving a borrower's application, servicers, including BAC, must complete an evaluation of the borrower for a loan modification under HAMP. Announcement 09-31 is available online at https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2009/0905.pdf and is incorporated by reference.

35. BAC was obligated to evaluate the Morrises under HAMP using the above-described steps under the waterfall.

36. Here, as described in more detail below, rather than follow the Fannie Mae servicing guidelines as it is required to do and evaluate the Morrises for a loan modification under HAMP, BAC lost and ignored the Morrises requests for evaluation for a loan modification for a period of almost two years, initiating foreclosure, charging thousands of dollars in costs, fees, and interest.

**Count I:**
**Consumer Protection Act, G.L. c. 93A**
**Failure to Comply with HAMP Guidelines**

37. The preceding allegations are repeated and realleged.

38. BAC is engaged in trade or commerce in Massachusetts, servicing and originating mortgages for residents of Massachusetts.

39. The Morrises are not persons entitled to bring an action under M.G.L. c. 93A, § 11.

40. BAC is the servicer of the Morrises' mortgage.

41. BAC and is obligated to follow Fannie Mae guidelines with respect to the Morrises.

42. BAC engaged in unfair or deceptive acts or practices with respect to the Morrises, in violation of the Consumer Protection Act, by violating Fannie Mae and HAMP guidelines as described in more detail below.

43. Prior to filing suit in July 2010, the Morrises struggled to get BAC to evaluate them for a loan modification for almost two years. They were repeatedly ignored, the wrongful foreclosure of their home was scheduled, and they were offered a plan that violated HAMP guidelines and actually increased, rather than decreased, their monthly mortgage payment.

44. The Morrises first fell behind on their mortgage in or around July 2008

45. The Morrises received a notice of default from BAC on July 22, 2008.

46. Their mortgage payments had fallen behind because the family business for which they both worked had cut back on their hours due to the economic depression.

47. For months before they had fallen behind, the Morries made their monthly payments by withdrawing from their savings.

48. When their savings ran out, the Morrises contacted BAC in or around October 2008 to inquire about whether there were any options such as a loan modification to help them catch up on their payments.

49. The Morrises remembered having received a solicitation from BAC in May 2008 in which BAC encouraged the Morrises to apply for a loan modification. The solicitation stated:

> **Dear Customer:**
>
> **We're here for you. You may qualify for a new program to help you keep your home.**
>
> **At Bank of America, we strive to provide you with financial solutions that make your situation easier. We demonstrate this by offering you a different kind of program that may be just what you need for your delinquent loan.**
>
> **....**
>
> **Take Action-We may be able to help you keep your home today!**

50. In October 2008, relying on this offer to consider them for the loan modification, the Morrises submitted a complete application for a loan modification with financial documentation.

51. The Morrises waited for a response to their October 2008 application but never received one. The Morrises became concerned that BAC was ignoring them.

52. BAC failed to evaluate this application.

53. The Morrises engaged a company to assist them with a loan modification that submitted their financial documentation to BAC again in or around February 2009.

54. This February 2009 application also included the financial information necessary for BAC to evaluate them for a loan modification.

55. BAC failed to respond to their February 2009 application.

56. The Morrises submitted another application to BAC in July 2009, including complete financial information.

57. BAC was obligated to evaluate the July 2009 application for a loan modification under HAMP.

58. BAC did not evaluate the July 2009 application under HAMP.

59. Instead, in or around August 2009, BAC orally offered a payment plan that ***increased*** the Morrises' mortgage payment to approximately $2,400 per month from approximately $2,254 per month.

60. This payment plan was not a loan modification under HAMP. In fact, this plan violated HAMP because it increased the Morrises' monthly mortgage payments.

61. The Morrises were concerned that a payment increase would be unaffordable.

62. The Morrises were also confused by BAC's attempt to increase their payments when the goal of the HAMP loan modification program is to decrease borrowers' monthly payments.

63. In September 2009, the Morrises then engaged counsel to assist them the conflicting messages from BAC and its failure to comply with the loan modification guidelines, which, at a minimum, should have reduced, rather than increased, their monthly mortgage payment.

64. From approximately September 2009 to January 2010, the Morrises were repeatedly informed by the negotiator assigned to their file that they were about to be offered a HAMP loan modification by BAC. This modification never was offered.

65. Furthermore, the Morrises' phone calls to the negotiator assigned to their file went unanswered for weeks, even after the negotiator's supervisor was contacted.

66. Finally, the BAC negotiator requested in January 2010 that the Morrises submit another application.

67. The Morrises submitted another application to the negotiator on January 26, 2010.

68. BAC requested additional financial information to be submitted. The requested information was promptly sent on February 4, 2010.

69. None of the Morrises' previous applications had even been considered for HAMP.

70. BAC then instructed its attorneys at Korde & Associates, P.C. to schedule and conduct the foreclosure sale of the Morrises' home in or around February 2010.

71. At the time BAC scheduled the foreclosure, BAC knew that the Morrises had never been properly evaluated for HAMP. BAC knew that HAMP guidelines prohibited scheduling a foreclosure before a homeowner has been evaluated for HAMP.

72. Fannie Mae Announcement 09-05R states that "To ensure that a borrower currently at risk of foreclosure has the opportunity to apply for the HAMP, servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program and, if eligible, an offer to participate in the HAMP has been made." Announcement 09-05R is available online at https://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2009/0905.pdf and incorporated by reference.

73. On February 11, 2010, the negotiator informed the Morrises that they would be approved for a HAMP loan modification if they agreed to escrow their taxes and insurance. The Morrises promptly agreed to do so.

74. A HAMP loan modification was never sent out by BAC.

75. Instead, on April 13, 2010, BAC sent out a non-HAMP modification agreement that again did not comply with HAMP underwriting guidelines, reducing the Morrises' payment by only about $2 (two dollars), to $2,252 per month from approximately $2,254 per month.

76. Under the information the Morrises submitted, and based on HAMP underwriting guidelines, they should have been offered a modification with a monthly payment of approximately $1,583, which was 31% of their gross monthly income of approximately $5,106.

77. After repeated communications, BAC finally canceled the foreclosure of the Morrises' home that had been wrongfully scheduled by BAC.

78. On April 13, 2010, the Morrises, by counsel, sent a demand letter pursuant to G.L. c. 93A, § 9, requesting an offer of settlement and describing BAC's unfair violations of the HAMP guidelines. (**Exhibit A**.)

79. Rather than respond to the Morrises' demand letter, BAC ignored it and has failed to respond to it.

80. BAC's failure to respond to the Morrises' demand letter was willful and knowing.

81. As a direct and proximate result of BAC's conduct described above, the Morrises suffered damages including damage to their credit, loss of time, accumulation of interest, initiation of foreclosure action by BAC, and assessment of late fees and costs.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray that the Court order the following relief:

A. A declaratory judgment that BAC violated G.L. c. 93A by failing to evaluate the Morrises for a loan modification under the Home Affordable Modification Program;

B. An award of actual damages, costs, and attorney's fees for BAC's violation of G.L. c. 93A;

C. An order that BAC immediately evaluate the Morrises for HAMP;

Respectfully submitted,

Plaintiffs,
Russell and Jennifer Morris,
By counsel,

*/s/ Josef C. Culik*
Josef C. Culik (BBO #672665)
Culik Law P.C.
100 Cummings Center
Suite 107K
Beverly, MA 01915
978-910-0248
978-910-0247 Fax
josef@culiklaw.com

May 4, 2011

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 4, 2011.

*/s/ Josef C. Culik*
Josef C. Culik